

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4311 | **DATE** | 5/12/2003 |
| **CASE TITLE** | Martin W. Smith vs. Elizabeth A. Bartolini | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] .Enter Memorandum Opinion and Order. For the reasons set forth, Bartolini's motion for summary judgment is granted; Smith's motion is denied; and summary judgment is awarded in favor of Bartolini. The NASD arbitration award is hereby confirmed in all respects. In her counter petition, Bartolini has also requested interest at the statutory rate from March 26, 2001, plus costs and disbursements. If Smith wishes to oppose these requests, he must file a brief within three weeks from the date of this opinion. Bartolini shall have two weeks thereafter to file a reply. The court will rule by mail

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | **Document Number** |
| | Notices mailed by judge's staff. | | | | |
| ✓ | Notified counsel by telephone. | | MAY 1 4 2003 date docketed | | 19 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TP | courtroom deputy's initials | 03 MAY 13 AM 9:34 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

DOCKETED
MAY 1 4 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARTIN W. SMITH )
    Applicant. )
)
v. ) No. 01 C 4311
)
ELIZABETH A. (nee Sipe) BARTOLINI, ) Judge John A. Nordberg
)
    Respondent. )

## MEMORANDUM OPINION AND ORDER

After a four-day hearing, a panel of NASD arbitrators found that Martin W. Smith committed fraud against Elizabeth Bartolini and ordered him to pay an award of more than a half million dollars including $100,000 in punitive damages. Smith filed this action seeking to vacate that award on the ground that the NASD arbitrators lacked jurisdiction to hear the dispute because Bartolini was not technically a "customer" under the Code of Arbitration Procedure and because the investment vehicle was not a "security." Bartolini filed a counter petition to confirm the award. *See* Federal Arbitration Act, 9 U.S.C. §§ 9, 10. Both sides have moved for summary judgment.

## BACKGROUND

The essential facts are undisputed. In 1997, Elizabeth Bartolini's husband died of cancer, leaving her with approximately $400,000 in life insurance proceeds, which then constituted the bulk of her net worth. Soon after her husband's death, she went to Martin W. Smith for advice on how to invest the proceeds. Smith was married to Bartolini's deceased husband's sister.

Smith is a man who – as the business expression goes – wore several hats. In addition to being Bartolini's brother-in-law, he was president, 50% shareholder, and chairman of the board of World Securities, Inc. ("WSI"). At the same time, he was president of Investors Financial, Inc. ("IFI"). During the relevant time period, WSI was registered as an SEC broker-dealer while IFI was an SEC registered investment adviser. Both WSI and IFI were Missouri corporations, both were located at the same address, and both used the same employees. However, for purposes of this case, they differed in one key respect – WSI was a member of NASD but IFI was not. As will be discussed below, this fact underlies Smith's central argument against arbitration.

When Bartolini approached Smith for investment advice, it is undisputed that she was emotionally fragile (due to the recent death of her husband) and was an inexperienced investor. It is also undisputed that Smith provided her investment advice, which she followed. Specifically, Smith advised Bartolini to put all her money into a single investment – World Capital Management, L.P. ("World Capital"), which operated a high-risk hedge fund that Smith created and managed. Both WSI and IFI were involved in its operation. IFI was the general partner and WSI provided brokerage services.[1]

Although Smith advised Bartolini to invest in World Capital, he advised her to do so indirectly through a complicated series of business entities. After consulting with attorneys for WSI, Smith established an irrevocable trust that was funded by the $300,000 of the life insurance proceeds. The trust in turn acquired all the outstanding stock of a shell corporation known as Jazzy Internet Services, Inc., a Nevada corporation ("Jazzy"), for a nominal amount and then

---

[1] World Capital also had the same address, shared the same office space, and had the same employees as WSI and IFI.

-2-

made a loan to Jazzy for $300,000. Jazzy used the money to purchase a limited partnership interest in World Capital. In return, Jazzy executed a promissory note back to the trust. In short, as Smith describes the investment, it was "twice removed" in that Bartolini was a beneficiary of a trust that owned the shares of a corporation that became a limited partner of World Capital.

Bartolini's "twice removed" investment in World Capital eventually declined to virtually nothing. Smith was the trading manager for World Capital and he made the trading decisions that resulted in more than a thousand trades, eventually leading to the loss of around $20 million of investors' money. However, during this time, WSI made approximately $2.2 million in commissions from World Capital.

On November 26, 1999, Bartolini filed a statement of claim with the NASD alleging that the World Capital investment was unsuitable because it involved speculative and high volume trading. On February 2, 2000, Smith executed a Uniform Submission Agreement in which he agreed to "submit the present matter in controversy [to arbitration], as set forth in [Bartolini's] statement of claim" and "to abide by and perform any [arbitration] award(s) rendered pursuant to this Submission Agreement." In the arbitration, Smith and WSI raised the same arguments they are making here; namely, that the arbitrators had no jurisdiction. The arbitrators twice rejected this argument – first on September 15, 2000 and again later at the hearing. Before the arbitration hearing began, Smith and WSI did not – as they had a right to do – bring this issue to federal court for a ruling on whether the dispute was arbitrable. A four-day hearing was held beginning in late January 2001. Smith participated in the hearing through his attorney and raised various defenses and arguments.

On March 26, 2001, the arbitrators ordered WSI and Smith, jointly and severally, to pay Bartolini $401,111.95 in out-of-pocket losses, $100,000 in punitive damages, $75,000 in attorneys' fees, and $15,000 for witness and other fees for a total of $591,111.95. The arbitrators specifically concluded that Smith and WSI (i) "committed fraud while acting in a fiduciary capacity;" (ii) "obtained [Bartolini's] money under false pretenses;" and (iii) engaged in a "malicious and willful violation of trust and confidence placed in them by [Bartolini]." The panel awarded Bartolini $100,000 in punitive damages to "punish [Smith and WSI] and deter them [] from similar treatment of public customers." (Arb. Award at 4.)

Smith and WSI filed this action seeking to vacate the arbitration award. Subsequently, WSI settled with Bartolini and is no longer a part of this action. Bartolini filed a counter petition to confirm the arbitration award. The parties agreed to file simultaneous cross-motions for summary judgment. We have reviewed these briefs as well as the supporting exhibits and affidavits.

## DISCUSSION

Smith argues that this dispute is not arbitrable under Section 10301 of the NASD Code of Arbitration Procedure because (i) Bartolini was not a "customer" and (ii) she did not purchase a "security." Neither argument has merit. *See* Sections I & II. Even if there were some doubt about whether this dispute were arbitrable based on the NASD Code, we would still find it arbitrable under the Uniform Submission Agreement executed by Smith. *See* Section III.

### I. Was Bartolini A "Customer" Under NASD Section 10301?

Both sides agree that the general question of whether this dispute is arbitrable is governed by NASD Code Section 10301(a), which states as follows:

> Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

Smith argues that Bartolini cannot show that she was a "customer" under this section. This argument contains two parts. First, he asserts that the above language contains an implied requirement that Bartolini must show either that she was a direct customer of the member firm (*i.e.* WSI) or that Smith dealt with her while he was acting solely in his role as an associated person of WSI. Second, he asserts that Bartolini cannot meet this implied requirement. As set forth below, neither the legal premise nor the factual support is persuasive.

### A.

The parties argue over the meaning of the term "customer" in Section 10301. To understand these arguments, it is important to consider this section from a broader perspective rather than trying to define one word in isolation.

Section 10301 contains several pathways to arbitration, as reflected by the use of the word "or" in lines two and three of the above quotation. In line two, the Section refers to a dispute between a "customer" and *either* (i) a "member" *or* (ii) an "associated person." In lines three and four, the Section imposes the additional requirement that the dispute must arise in connection with *either* (i) "the business of such member" *or* (ii) "the activities of such associated person."

Applying the latter half of the two clauses, arbitration is required if the dispute is between a customer and an associated person arising out of the activities of the associated person.

-5-

Interpreting this language in a straightforward and commonsense manner, we think it is clear that this dispute is arbitrable regardless of whether or not (as discussed in Section I.B) there was any connection to WSI.

First, it is undisputed that Smith was an associated person. Second, there can be no dispute that Bartolini's claims arose out of the "activities" of Smith – specifically, his investment advice and his actions in carrying out this advice. Third, the only remaining point even arguably in dispute is whether Bartolini was a "customer." Smith focuses heavily on the word "customer" and believes that it carries with it an implied requirement that Bartolini must have been a customer *of the member firm* or that the associated person must have been *acting in his role as an associated person at the time of the dispute.*

We are not persuaded by either assertion. Section 10301 contains no language explicitly imposing any such requirements. Moreover, the first assertion – that Bartolini must show that she was a customer *of WSI* – makes no sense as a matter of logic. As noted above, Section 10301 contains two separate pathways to arbitration – one involving disputes with a member firm and a separate one involving disputes with an associated person. Under Smith's interpretation, the second pathway would be redundant and would collapse into the first.

The second assertion – that Bartolini must show that Smith was *acting in his role as an associated person of WSI* – has no merit as well. Again, there is no such requirement in the text of 10301, which merely refers to the fact that one party to the dispute must have the general status of an "associated person." Moreover, Section 10301 does not require (as it could have) that the dispute with the associated person be related to the business of the member firm. Instead, it adopted much broader language, merely requiring that the dispute "arise[] in

-6-

connection" with the "activities" of that person. As the Seventh Circuit has noted, this language is "quite broad." *Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998).

Smith does point to one district court decision – *Investors Capital Corp. v. Brown*, 145 F.Supp.2d 1302 (M.D. Fla. 2001) – to support his claim that there must be some additional link to a member firm. In *Brown*, the court stated that "being a customer of an associated person is not, in itself, a sufficient basis for compelling [NASD] arbitration." *Id.* at 1307. We are not inclined to follow *Brown* in this case for several reasons.

First, *Brown* dealt with a different (and more compelling) issue than the one here. The investors in that case sought to compel a securities firm to arbitrate investment losses that arose from purchases they made from two men who, at the time of purchase, were not yet associated with the securities firm but who were later hired by the firm. The issue was thus akin to successor liability. Believing that it would "do significant injustice to the reasonable expectations of NASD members," the court concluded that arbitration was not required under Section 10301 when the dispute arose before the person became associated with the member firm. *Id.* at 1308. The court's decision was not based on any specific language in 10301 but was more of a policy decision. In fact, the court admitted that its assertion that a customer of an associated person is not by itself enough to warrant arbitration was based merely on *dicta* from another case. *Id.* at 1307.

Second, this case raises no such concern about remote successor liability, as Smith clearly gave Bartolini investment advice during the same time period that he was working as an associated person for WSI.

Third, the majority of courts have not interpreted the language of Section 10301 in the way the *Brown* court did. This point was documented by the district court in *Hornor, Townsend & Kent, Inc. v. Hamilton*, 218 F.Supp.2d 1369 (N.D. Ga. 2002). In *Hornor*, a brokerage firm sought to avoid NASD arbitration, claiming that the investors were never "customers" of the firm because they did not open an account with the firm, did not receive any account statements from the firm, and did not otherwise have any direct relationship with the firm and because they never purchased any securities from the firm. *Id.* at 1376. (Smith makes many of the same arguments here.) The court conceded that the firm was correct in its factual assertions but nonetheless concluded that they were "irrelevant" because, under the "plain language of Rule 10301," a claimant is not required to show that he was a customer of the brokerage firm but only that he was a customer of the associated person. *Id.*

The brokerage firm in *Hornor*, like Smith here, cited to *Brown* as authority for the proposition that a claimant must show something more than that he was a customer of the associated person. After reviewing the existing case law, the *Hornor* court concluded that the holding in *Brown* was "contrary to the plain language of Rule 10301." *Id.* The court's analysis is thorough and worth quoting at some length:

> The Court rejects th[e] holding by the court in [*Brown*] because it is contrary to the plain language of 10301. Rule 10301 states that any dispute "between a customer and a member and/or associated person" that arises "in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code." NASD Code § 10301. The Court has reviewed the cases cited by the parties, and has conducted a thorough review of other cases that have addressed this issue, and has been unable to uncover any other decision other than [*Brown*], holding that a NASD member is not required to arbitrate claims brought by the customer of an "associated person." Indeed, every other court that has addressed this issue has reached a contrary result; *i.e.*, a claim brought by a customer of an associated person plainly

-8-

falls within the scope of Rule 10301, and is subject to the mandatory arbitration procedure. *See, e.g., John Hancock Life Ins. Co.*, 254 F.3d at 59-60 (expressly rejecting holding of [*Brown*] as contrary to plain language of Rule 10301); *see also Vestax Sec. Corp.*, 280 F.3d at 1081-1082 (customers of an associated person entitled to arbitration); *BMA Fin. Servs., Inc. v. Guin*, 164 F.Supp.2d 813, 820 (W.D. La. 2001) ("'customer' plainly refers to either the member's or the associated person's customer"); *Vestax Sec. Corp. v. Skillman*, 117 F.Supp.2d 654, 657 (N.D. Ohio 2000) ("The fact that defendants never opened accounts with plaintiff is irrelevant. By conducting business with plaintiff's registered representative, defendants conducted business with plaintiff and became its customers.") (citing *WMA Sec., Inc. v. Ruppert*, 80 F.Supp.2d 786, 789 (S.D. Ohio 1999); *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.*, 65 F.Supp.2d 1371, 1381-82 (S.D. Fla. 1999) (NASD member forced to arbitrate a claim brought by a customer of an associated person, even when the account was held at another brokerage firm).

*Id.* 1376-77 (footnote omitted).[2]

In sum, we do not agree with the first prong of Smith's argument and find that Bartolini need only show that she was Smith's customer (not WSI's customer) and that her dispute arose out of his activities. She can easily meet this burden. No one would dispute that she was Smith's customer. She met with him face-to-face. He gave her investment advice. She followed that advice. It is that simple. Therefore, arbitration is warranted on this ground alone.

---

[2]To be fair, we note that – a week after *Hornor* – one district court did rely on the reasoning of *Brown*. *See Mony Sec. Corp. v. Vasquez*, 238 F.Supp.2d 1304, 1307-08 (M.D. Fla. 2002). However, this decision does not change our conclusion because, like *Brown*, it addressed a more compelling factual scenario.

**B.**

Even if we were to proceed on the assumption that Bartolini must establish some connection or customer relationship with WSI, we would still find in her favor given that Smith and WSI were so closely intertwined and given the broad scope of the arbitration provision.

To the extent that a "customer" relationship or connection is required, most courts have only required that there be "some" connection between the claimant and the member firm. Consistent with a broad and non-technical understanding of the term customer, courts have not required that a claimant open a formal account or establish a traditional business relationship in order to be a customer. For example, in the *Brown* case discussed above, the court made it clear that the claimant merely has to show some kind of "informal relationship." 145 F.Supp.2d at 1308. Similarly, in *Lehman Brothers Inc. v. Certified Reporting Co.*, 939 F.Supp. 1333 (N.D. Ill. 1996), the court came to the same conclusion in interpreting a similar NYSE arbitration rule. "Defining customers to include not only those who executed purchases with member firms, but also those who maintained a less formal business relationship at the time of the alleged misconduct, furthers NYSE policy and recognizes market reality." *Id.* at 1340.[3]

Applying this broad definition here, we find that there is sufficient evidence to show that Bartolini was a customer of WSI. It is important to put this case into perspective. Unlike most cases in this area, which involve a claim by a securities firm that an agent did something without

---

[3]*Accord WMA Sec., Inc. v. Ruppert*, 80 F.Supp.2d 786, 789 (S.D. Ohio 1999) (investors were "customers" of the member firm even though they that had no formal account with the firm and even though their investments were not approved by the member firm); *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.*, 65 F.Supp.3d 1371, 1380-82 (S.D. Fla. 1999) (investors were "customers" even though they did not have any account with the brokerage firm).

its knowledge or permission, there is no such claim here. In fact, for all practical purposes, Smith and WSI were inseparable as the following undisputed facts illustrate.

Smith was president, chairman of the board, and a 50% shareholder of WSI. He worked out of WSI's offices. WSI was a full-service broker-dealer with an emphasis on retail sales, which included giving investment advice to individuals. Smith gave Bartolini investment advice. In doing so, he consulted with (among others) attorneys for WSI. Bartolini's money was ultimately put into the World Capital, which was an investment vehicle created for Smith's clients and which shared the same offices and employees with WSI. WSI was trading manager for World Capital and received $2.2 million in revenue during the same time that the partnership lost $20 million in investors' money. WSI passed these profits along to Smith in the form of a salary (ranging between $200,000 and $500,000) and other substantial benefits. At one point, Bartolini was given a booklet with materials about her investment, which had a sticker on it that said World Securities, Inc. (Arb. Tr. 43.)

If these facts were not enough, Smith directly conceded in the arbitration hearing that Smith would have been reasonable under the circumstances in believing that he was dealing with her in some capacity as a representative of WSI. (Arb. Tr. 222.) Why did he make such a concession? Obviously because he knew that there was an objective basis for her to believe that he was working for WSI. In addition, Bartolini's expert witness in the arbitration hearing testified that, based on industry practice, Bartolini was a customer of WSI. (Arb. Tr. 484-85.)

In this litigation, Smith argues that, despite the abundance of facts suggesting that he was working for WSI and suggesting that Bartolini had reasonable grounds to believe that he was working for WSI, he was really working *solely* for IFI at the time that he gave her investment

-11-

advice. This is the argument that he was not wearing his WSI hat at the time. The sole basis for this argument is the fact that WSI was registered with the SEC as a broker-dealer at the time and that IFI was a registered investment adviser. Smith argues that the "only logical conclusion to draw" is that Bartolini must have dealt with him only in his role as a agent for IFI.

This argument-from-logic ignores the facts and strains credibility. First, the argument is directly contradicted by the undisputed fact that WSI could give investment advice incidental to its business. Second, even if there were some regulatory requirement preventing Smith from giving investment advice, this does not automatically mean that he followed it. After all, the arbitrators found that he committed fraud in his dealings with Bartolini. Third, as also noted above, Smith testified that Bartolini would have been reasonable in believing that he was working for WSI. Fourth, not only has Smith ignored these undermining his argument, he also has failed to pointed to *any* facts supporting his argument.

Moreover, given the close interrelationship of these entities, we think that the burden should be on Smith (not the customer) to provide clear evidence that he was *not* acting for WSI. It is undisputed that WSI, World Capital, and IFI were thoroughly intertwined. They shared the same offices and employees. There is no evidence to suggest that Smith ever took steps to keep these roles separate or to alert Bartolini (or others) of his revolving allegiances. Smith apparently believes that he was free to put on his metaphorical WSI hat one minute of the day and then put on his IFI the next minute and that his customers should somehow know the difference. Yet, how was Bartolini to know that he was "switching hats" at various times? *See Washington Square Sec., Inc. v. Sowers*, 218 F.Supp.2d 1108, 1117 (D. Minn. 2002) ("The customers are not the ones who will usually know the vagaries of the mechanism by which a person becomes

involved with the brokerage firm"). The answer is that she had no way of knowing that Smith was allegedly dealing with her in a special and limited role as agent of one particular entity. To the contrary, any person in this situation would have been reasonable in believing that Smith was working at least in part on behalf of WSI.

This case does not present any legitimate concern about remote liability to a member firm similar to the concern that motivated the *Brown* court. In such cases, the member firm came to court and contested jurisdiction on the ground that it had no connection with or close relationship to the agent and did not profit in any way from the agent's activities. *See, e.g., Mony Sec. Corp. v. Vasquez*, 238 F.Supp.2d 1304, 1307 (M.D. Fla. 2002) (securities firm did not receive any profits or commissions from the transactions at issue). In contrast here, WSI has settled with Bartolini and is not contesting the claim that she was its customer. We therefore have the odd scenario of Smith arguing that Bartolini was not WSI's customer even though WSI itself is not here making the argument. Moreover, it is clear that WSI was closely involved in this matter and that it benefitted from Bartolini's investments in a direct way in the form of large commissions on trades made for World Capital.

## II. Whether There Was A "Security"

In addition to arguing that Bartolini was not a customer, Smith very briefly makes a second argument that this dispute was not arbitrable because the trust created for Bartolini to invest in supposedly was not a security. Smith relies on the definition of a "security" applied in the Securities Act of 1933 and the Securities Exchange Act of 1934 and also on the Supreme Court's ruling in *SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946). He argues that Bartolini, by investing in the trust, was not making an "investment of money" in any traditional sense and that there was no "horizontal commonality" in a common enterprise.

We find this argument unconvincing. Smith has not cited to any case indicating that the NASD Code contains any requirement that the investor must have purchased a security as defined by the 1933 or 1934 Acts. The pertinent sections of the Code – 10101 and 10301 – do not tie arbitrability to the presence of a "security" but instead refer to a "dispute," "claim," or "controversy." Moreover, as Bartolini points out, the Seventh Circuit in *Miller* rejected a similar argument, holding that an investor's fraudulent conveyance claim was arbitrable despite the fact that it did not involve the buying or selling of securities. 139 F.3d at 1136. Finally, Smith's technical argument that there was no security would be contrary to the spirit and structure of the Code.

## III. The Uniform Submission Agreement.

Even if we somehow concluded that this dispute were not arbitrable under the NASD Code, we would still find it arbitrable under a *separate* agreement to arbitrate. On February 2, 2000, after Bartolini filed her statement of claim, Smith executed a Uniform Submission Agreement in which he agreed (without reserving any rights to contest jurisdiction) to "submit

the present matter in controversy [to arbitration], as set forth in [Bartolini's] statement of claim" and "to abide by and perform any [arbitration] award(s) rendered pursuant to this Submission Agreement." On its face, this language constitutes a clear and unqualified agreement to arbitrate the disputes contained in the Statement of Claim.

In *First Montauk Sec. Corp. v. Menter*, 26 F.Supp.2d 688 (S.D.N.Y. 1998), the district court concluded that, when a securities firm executed a Uniform Submission Agreement, it entered into "a valid, binding agreement to submit *all* issues, including the threshold issue of arbitrability, to the [NASD] arbitration panel." *Id.* at 689 (emphasis added). In that case, the securities firm, like Smith here, submitted a Uniform Submission Agreement along with a motion to dismiss the arbitration based on lack of jurisdiction. As here, the NASD arbitrators twice denied the motion. Thereafter, unlike this case, the securities firm filed a claim in federal court seeking to enjoin the arbitration *before* a hearing on the merits began. The court dismissed the action, finding that the language of the Uniform Submission Agreement was "clear" that there was an agreement to arbitrate and that the arbitration therefore should go forward. *Id.*

The securities firm (First Montauk) sought to get around this clear language by arguing that it tendered the Uniform Submission Agreement "solely for administrative purposes [based on] experience that without the form submission agreement, the NASD staff would not process [the] motion to dismiss." *Id.* The court rejected the argument for two reasons. First, relying on hornbook law, it noted that "an uncommunicated subjective intent" is irrelevant in interpreting a contract. *Id.* Therefore, it did not matter that First Montauk (allegedly) believed that the language of the agreement meant something other than what it said. Second, the court concluded that First Montauk "purposefully misled" the arbitrators by proceeding in this manner:

-15-

> the NASD panel would never have considered the motion to dismiss for lack or
> arbitrability had First Montauk not first expressly acknowledged the panel's
> authority to resolve the motion conclusively. Having purposefully misled the
> NASD arbitrators as to its intent to submit to a binding ruling on arbitrability,
> First Montauk may not now seek refuge in the argument that it was only
> pretending to be bound.

*Id.*

We find this reasoning and conclusion persuasive. Smith tries to avoid the clear language of the Uniform Submission Agreement by making an argument similar to the one rejected in *First Montauk*. In his Application To Vacate Arbitration Award, Smith claims that he executed the Uniform Submission Agreement because there is no real "motion practice" under the NASD Code and because he "must" submit to an arbitration demand made by a customer. (¶ 10.) We fail to see why he was required to submit to arbitration if there was no jurisdiction. Like the district court in New York, we cannot simply ignore clear and unequivocal language indicating that Smith agreed to arbitrate all the claims set forth in Bartolini's Statement of Claim.

## CONCLUSION

For the reasons set forth above, Bartolini's motion for summary judgment is granted; Smith's motion is denied; and summary judgment is awarded in favor of Bartolini. The NASD arbitration award is hereby confirmed in all respects. In her counter petition, Bartolini has also requested interest at the statutory rate from March 26, 2001, plus costs and disbursements. If Smith wishes to oppose these requests, he must file a brief within three weeks from the date of this opinion. Bartolini shall have two weeks thereafter to file a reply. The court will rule by mail.

**ENTER:**

_____
JOHN A. NORDBERG
Senior United States District Court Judge

DATED: May 12, 2003